PEOPLE v PROVEAUX

Docket No. 87816. Submitted October 21, 1986, at Lansing. Decided January 21, 1987.

William D. Proveaux was convicted of first-degree criminal sexual conduct following a jury trial in Oakland Circuit Court, Robert C. Anderson, J. Defendant appealed.

The Court of Appeals *held:*

1. The fact that the victim managed to throw defendant's knife, with which he had threatened her, from her house into the street before penetration occurred does not prevent defendant from being convicted of first-degree criminal sexual conduct. Defendant had the knife when he began the assault and the sexual penetration was part of a continuing event beginning with the armed assault. Defendant's conviction was supported by sufficient evidence.

2. The trial court did not err in admitting serological evidence including defendant in a class of individuals who could have committed the crime. Defendant's argument that no foundation was laid for the scientific acceptance and reliability of the analytical methods used was not preserved for appellate review. Furthermore, if any error did occur in the court's admission of the evidence, the error was harmless since there was other, overwhelming evidence of defendant's guilt.

Affirmed.

1. Rape — First-Degree Criminal Sexual Conduct — Weapons.

The fact that an armed assailant loses his weapon at some point before sexual penetration occurs will not prevent him from being convicted of first-degree criminal sexual assault; it is enough that the assailant had the weapon when the assault began (MCL 750.520b; MSA 28.788[2]).

References

Am Jur 2d, Appeal and Error §§ 601, 602.

Am Jur 2d, Evidence § 1080.

Am Jur 2d, Rape §§ 20-24.

Am Jur 2d, Trial § 417.

See the annotations in the Index to Annotations under Appeal and Error; Evidence; Rape.

2. APPEAL — EVIDENCE — PRESERVING QUESTION.

   An objection to the admission of evidence on a basis not raised in the trial court will not be heard for the first time on appeal absent a showing of manifest injustice.

3. CRIMINAL LAW — PHYSICAL EVIDENCE — BODILY SUBSTANCES — WEIGHT — JURY.

   Deposits of blood and other identifiable substances do not differ from other pieces of physical evidence or other observations that show possible connections between a defendant and criminal acts and may be properly admitted, the weight of the evidence being left for the jury's determination.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief, Appellate Division, and *Paul J. Fischer,* Assistant Prosecuting Attorney, for the people.

*Alvin C. Sallen,* for defendant on appeal.

Before: SULLIVAN, P.J., and SHEPHERD and R. M. SHUSTER,* JJ.

SHEPHERD, J. Defendant was convicted of first-degree criminal sexual conduct, MCL 750.520b; MSA 28.788(2), following a jury trial. On appeal, defendant raises a question of first impression: whether he could be convicted of first-degree criminal sexual conduct on the theory that he was armed within the meaning of the statute when the victim had disarmed defendant prior to penetration. We answer in the affirmative. Defendant also argues that the circuit court erred in admitting serological evidence including defendant in a class of individuals who could have committed the crime. We find no error and affirm defendant's conviction.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

I

The victim went to a bar with her friend Meredith and Meredith's brother Donald. Defendant, whom the victim claimed not to know, asked the victim to dance, and she declined. Defendant made a "snide remark." Defendant later danced with Meredith while the victim joined some friends at another table. When she returned, defendant had joined Meredith and Donald. Meredith and Donald asked if they could play pool on the pool table in the victim's basement. The victim agreed so long as they kept quiet.

When the victim arrived home, several people were present, including defendant. The victim told Meredith and Donald to make sure everyone left when the pool-playing was over and that only Meredith should remain.

The victim then went to bed in her first-floor bedroom. She closed the door, but there was no lock. The next thing she remembered was being awakened by defendant with a knife at her throat. Defendant said, "You're not going to tell me no this time, bitch, because I'll cut your throat." The victim got up, saying she wanted to go to the bathroom. She went to the basement stairs, assuming that everyone was still there, but no one was. She noticed that the back door was wide open and went outside. Defendant pulled her back in, grabbing her from behind and putting the knife to her throat. Back in the house, the victim got away from defendant again when he lost his balance, and she went out the front door and started to yell. Again, defendant grabbed her from behind, put his hand over her mouth and the knife to her throat, and told her to "loosen up" or he would cut her. At that point, the victim somehow got the knife out of defendant's hand and threw it towards

some bushes or the street. Defendant began hitting her on the side of the head and pulled her back into the house. Defendant then pulled the victim to the floor and had sexual intercourse with her.

Afterwards, the victim got up, saying she was going to get a cigarette. Defendant said he would get her one of his own. When he stepped out the front door, the victim locked it. She secured the back door, from which the door handles had been taken, by slipping a knife into the jamb. The victim called the police, who arrested defendant outside the house. Both police officers observed that defendant's clothes were in disarray: his shirt was unbuttoned, his pants were unzipped, and his shoes were untied. The knife was found in the street, apparently four or five feet from the curb.

At the close of the prosecutor's proofs, defendant moved to dismiss the first-degree criminal sexual conduct charge on the grounds of insufficient evidence. Alternatively, defendant moved for a reduction of the charge to assault with intent to commit first-degree criminal sexual conduct or to third-degree criminal sexual conduct. Defendant argued that, according to the evidence, the victim had disarmed him before sexual penetration was accomplished. Penetration was therefore accomplished by force or coercion alone, satisfying the elements of third-degree criminal sexual conduct, but not while armed with a dangerous weapon, as required for first-degree sexual conduct. The court denied defendant's motion.

II

The elements of third-degree criminal sexual conduct relevant to this case require sexual penetration accomplished by force or coercion, MCL 750.520d(1)(b); MSA 28.788(4)(1)(b). First-degree

criminal sexual conduct requires sexual penetration and the presence of one of eight aggravating circumstances. The statutory provision pertinent to this case is MCL 750.520b(1)(e); MSA 28.788(2)(1)(e):

(1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:

* * *

(e) The actor is armed with a weapon or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon.

In *People v Davis,* 101 Mich App 198, 201-203; 300 NW2d 497 (1980), defendant's rifle was lying six feet away while penetration occurred. This Court concluded that possession included both actual and constructive possession. Constructive possession occurs if one has proximity to the article together with indicia of control. The Court held that the actor need not have the weapon in his hands while committing the offense charged, so long as he has knowledge of the weapon's location and it is reasonably accessible.

Subsequently, in *People v Flanagan,* 129 Mich App 786, 797-798; 342 NW2d 609 (1983), the defendant forced two young girls to perform several acts of sexual intercourse and fellatio after displaying a knife which he held to the throat of one girl and forcing them into his car. The defendant argued that he could not be convicted of all counts of first-degree criminal sexual conduct charged. The defendant argued that he was not armed during two incidents of fellatio because the knife was not on his person when those assaults occurred. Citing *Davis,* the Court rejected the defendant's argu-

ment. The evidence showed that the knife was on the seat next to defendant during the assaults and, after the initial assaults, defendant retrieved the knife and held it clenched in his teeth during further assaults.

The instant case is different from both *Davis* and *Flanagan.* Here, the testimony showed that defendant's knife had been thrown outside the house before sexual penetration occurred inside the house. The knife was not within defendant's reach and it is unclear if defendant knew where the knife landed. It would be difficult to say that defendant had constructive possession of the knife.

Criminal statutes are to be strictly construed. *People v Saxton,* 118 Mich App 681, 690; 325 NW2d 795 (1982). We believe, however, that defendant was armed with a weapon within the statute's meaning so as to make the crime first-degree criminal sexual conduct. Defendant had possession of the knife when he began his assault on the victim. When he awakened her, he held the knife at her throat. When the victim went out the back door, defendant pulled her back into the house with the knife at her throat. When she got away a second time and headed out the front door, defendant followed her and again put the knife to her throat, telling her to "loosen up" or he would cut her.

It is enough that defendant began the assault with a knife, putting the victim in fear and traumatizing her. The sexual penetration was part of a continuing event beginning with the armed assault. Undoubtedly, the Legislature intended to discourage the use of weapons by elevating forcible sexual penetration to a first-degree offense when the offender is armed. The possession of a weapon makes the sexual assault more reprehensible, increases the victim's danger, and lessens the vic-

tim's chances of escape. *People v Hurst,* 132 Mich App 148, 152; 346 NW2d 601 (1984). The statutory purpose of a higher penalty for the more reprehensible crime must continue through the assault even if the accused is disarmed in this fashion. A policy that prevents conviction of the first-degree offense merely because at some point during the criminal transaction the offender lost his weapon would not be consonant with the Legislature's intent. A rule requiring actual or constructive possession of the weapon through the course of the sexual assault would mean that a defendant could first subdue the victim with a weapon and then discard it before actual penetration. Such a rule would mean that the victim's actions in defending herself lessened the crime's seriousness.

The trial court did not err in denying the motion to reduce the charge. Moreover, viewing the evidence in the light most favorable to the prosecutor, a rational trier of fact could have found the crime's essential elements proven beyond a reasonable doubt. The trial court therefore did not err in denying defendant's motion to dismiss at the close of the prosecutor's proofs. Defendant's conviction was supported by sufficient evidence. *People v Petrella,* 424 Mich 221, 268; 380 NW2d 11 (1985).

III

David Woodford, a laboratory scientist with the Michigan State Police Crime Laboratory specializing in forensic serology, testified for the prosecution. Based on an analysis of defendant's whole blood and a dried saliva sample, Woodford determined that defendant's blood type is A, his PGM blood enzyme is type 1, and defendant is a secreter, that is, he secretes factors from his ABO blood type into his body fluids. Woodford then

analyzed a dried semen stain on the victim's night-gown. The stain had been stored in liquid nitrogen to preserve any traces of PGM. Woodford found that the stain contained two blood group factors, A and H, and concluded that the semen donor was a secreter. (According to Woodford, an H factor always accompanies an A factor.) Woodford also found PGM type 1 in the stain. Multiplying the percentages of type A blood, type 1 PGM, and secreters in the white male population, Woodford calculated that 16.4 percent of the white male population possess all three of the blood characteristics revealed by the dried semen stain on the victim's nightgown. The inference to be drawn, then, was that defendant was a member of a relatively small class of individuals who could have committed the criminal act.

Defendant argues that this was the same kind of blood analysis used in *People v Young,* 418 Mich 1, 17-25; 340 NW2d 805 (1983) (*Young I*), which held that electrophoresis results should not have been admitted without a showing by disinterested and impartial expert witnesses that the test was reliable and had achieved general acceptance in the scientific community. *Young I* remanded for a hearing on those issues. The Supreme Court recently held in *People v Young (After Remand),* 425 Mich 470; 391 NW2d 270 (1986) (*Young II*), that it had not been shown on remand that these evidentiary standards were met. The Court found disagreement within the scientific community with regard to the reliability of thin gel multisystem electrophoresis analysis of evidentiary blood stains and the effect of crime scene contaminants. The precise issue in *Young II* was whether electrophoresis of evidentiary blood stains passed the test of general acceptance in the scientific community. 425 Mich at 485. Electrophoresis analysis of semen

stains was not before the Court. 425 Mich 505, n 1 (BOYLE, J., dissenting).

The instant record is devoid of any reference to electrophoresis. Given the narrow issue involved in *Young II,* we question its relevance to this case.[1] While defendant argues that no foundation for the scientific acceptance and reliability of Woodford's analytical methods was laid, citing *Young I,* our review of the record discloses a failure to preserve those issues for review. Defendant's counsel objected only to Woodford's expert qualifications with regard to using the various population percentages and the general acceptance of those figures by the scientific community. After Woodford testified about those issues, his testimony and calculations were admitted without further objection. Absent a specific objection to any lack of foundation for the analytical evidence, we will not review the alleged error unless manifest injustice has occurred. *People v Federico,* 146 Mich App 776, 794-795; 381 NW2d 819 (1985). If any error existed, we believe it was harmless, as will be shown below. We note that the *Young II* Court also conducted a harmless error analysis, though with different results under the facts of that case.

Defendant also argues that it was improper to admit the statistical evidence including defendant in a class of persons who could have committed the crime. Defendant challenges the method by which the percentage of white males having all three blood characteristics was calculated, stating that no foundational evidence established that the probabilities of such individual characteristics were independent so as to allow their multiplication to achieve a final result. As noted above,

---

[1] The facts of this case differ from those in *People v Holbrook,* 154 Mich App 508; 397 NW2d 832 (1986), which did involve electrophoretic analysis of a blood stain on the defendant's shoe.

defendant failed to preserve this issue by a specific objection. Nor did defendant's counsel explore the alleged faults in Woodford's calculations through cross-examination.

We believe, in accord with a number of other panels of this Court considering the issue, that such evidence is relevant, that it is like other physical evidence linking a defendant to a criminal act, and that it is for the jury to decide how much weight should be given such evidence.[2] Such evidence is consistently used by defense attorneys when the statistical evidence favors a defendant. We believe such evidence can be used by either party.

In any event, even if Woodford's calculations of population percentages were improperly admitted, the error was harmless for the same reasons as was any error in admitting evidence of Woodford's analyses. The victim identified defendant to the police officers who arrived at the scene shortly after she was assaulted. The officers arrested defendant outside the victim's house with his clothing in disarray and his pants unzipped. Both the officers and the victim identified defendant at trial. There was thus overwhelming evidence of defen-

[2] See, e.g., *People v Traylor,* 145 Mich App 148, 152; 377 NW2d 371 (1985); *People v Goree,* 132 Mich App 693, 700-704; 349 NW2d 220 (1984); *People v Thorin,* 126 Mich App 293, 301-303; 336 NW2d 913 (1983); *People v Camon,* 110 Mich App 474, 479-480; 313 NW2d 322 (1981), lv den 414 Mich 859 (1982); *People v Horton,* 99 Mich App 40, 49-51; 297 NW2d 857, vacated on other grounds 410 Mich 865 (1980).

Other cases have found error, but considered it harmless under the circumstances. See *People v McMillen,* 126 Mich App 211, 216-218; 336 NW2d 895 (1983); *People v Sommerville,* 100 Mich App 470, 492-493; 299 NW2d 387 (1980), lv den 417 Mich 1022 (1983); *People v Sturdivant,* 91 Mich App 128, 131-134; 283 NW2d 669, lv den 407 Mich 933 (1979). Judge KELLY reconsidered his *Sturdivant* position in a concurring opinion in *People v White,* 102 Mich App 156, 165; 301 NW2d 837 (1980), and concluded that blood-type evidence could be used to include a defendant in a group when the probative value of such evidence outweighs its prejudicial effect, as in the case of narrow percentage classification.

dant's guilt. Any error resulting from the admission of evidence concerning the analysis of the semen stain and the statistical inferences drawn from those results could only be harmless.

Affirmed.