PEOPLE v ADAMS

Docket No. 125921. Submitted February 5, 1992, at Lansing. Decided
    August 3, 1992, at 9:25 A.M. Leave to appeal sought.

George Adams was convicted by a jury in the Oakland Circuit
    Court, Fred M. Mester, J., of one count of kidnapping, two
    counts of first-degree criminal sexual conduct, and one count of
    armed robbery. He was sentenced to life imprisonment for the
    kidnapping conviction and to 70 to 150 years' imprisonment for
    each of the other convictions. He appealed, alleging errors in
    the admission into evidence of the results of deoxyribonucleic
    acid (DNA) identification testing of a sample of dried semen
    taken from the victim's clothing and in the trial court's failure
    to articulate sufficient reasons for imposing sentences that
    departed from the sentencing guidelines range.

    The Court of Appeals held:

    1. The trial court did not err in allowing the test results in
    evidence. The prosecution established that DNA identification
    testing is generally accepted as reliable in the scientific commu-
    nity. Trial courts may take judicial notice of such reliability
    and may admit test results into evidence where the prosecution
    establishes that generally accepted laboratory procedures were
    followed. The company that did the testing in this case followed
    such procedures.

    2. The trial court did not abuse its discretion in admitting
    into evidence the statistical analysis of the DNA identification
    testing. The record contains an adequate foundation and proof
    of independence of the analysis, and the evidence was relevant.

    3. The trial court failed to articulate, either on the record or
    on the sentencing information report, sufficient reasons for
    departing from the sentencing guidelines range. The proper

REFERENCES

Am Jur 2d, Criminal Law §§ 537, 538; Expert and Opinion Evidence
    §§ 278, 296; Rape § 61.
Admissibility of DNA identification evidence. 84 ALR4th 313.
Admissibility, in prosecution for sex-related offense, of results of
    tests on semen or seminal fluids. 75 ALR4th 897.
Comment Note.—Length of sentence as violation of constitutional
    provisions prohibiting cruel and unusual punishment. 33 ALR3d
    335.

remedy where the court fails to articulate its reasons for departing from the guidelines and sentences the defendant to a sentence more than three times the minimum sentence recommended by the guidelines is to vacate the defendant's sentences and to remand the case to the trial court for resentencing. The defendant need not be resentenced by a different judge.

Convictions affirmed, sentences vacated, and case remanded for resentencing.

GRIFFIN, J., dissenting in part, stated the trial court adequately articulated its reasons for departing from the sentencing guidelines, and that the sentences are valid and proportionate to the seriousness of the circumstances surrounding the offenses and the offender. A remand for completion of the sentencing information report guideline departure form is all that is necessary.

1. CRIMINAL LAW — EVIDENCE — DNA IDENTIFICATION TESTING — STATISTICAL ANALYSIS.

Deoxyribonucleic acid (DNA) identification testing is generally accepted in the scientific community as reliable; trial courts may take judicial notice of such reliability and may admit test results into evidence where the prosecution establishes that generally accepted laboratory procedures have been followed; statistical analysis of the DNA identification testing may be admitted where an adequate foundation and proof of its independence is shown.

2. CRIMINAL LAW — SENTENCES — SENTENCING GUIDELINES — DEPARTURE — ARTICULATION OF REASONS.

A court that imposes a sentence that exceeds the sentencing guidelines' recommended minimum range must articulate, both on the record at sentencing and on the sentencing information report, its reasons for departure from the sentencing guidelines range; the proper remedy for failure to articulate where the sentence imposed exceeds by three times the minimum sentence recommended by the guidelines is to vacate the sentence and to remand for resentencing.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, *Michael J. Modelski,* Chief, Appellate Division, and *Richard H. Browne,* Assistant Prosecuting Attorney, for the people.

*Faintuck, Shwedel & Wolfram* (by *William G. Wolfram*), for the defendant on appeal.

Before: HOLBROOK, JR., P.J., and GRIFFIN and MARILYN KELLY, JJ.

HOLBROOK, JR., P.J. Defendant appeals as of right his jury conviction of one count of kidnapping, MCL 750.349; MSA 28.581, two counts of first-degree criminal sexual conduct, MCL 750.520b; MSA 28.788(2), and one count of armed robbery, MCL 750.529; MSA 28.797. He claims that the trial court erred in admitting into evidence the results of deoxyribonucleic acid (DNA) identification testing completed on a sample of dried semen taken from the victim's blue jeans. After carefully reviewing the evidence, we find that the trial court did not err in allowing the results in evidence. Defendant also claims that the trial court erred in failing to articulate sufficient reasons for imposing disproportionate sentences that departed from the sentencing guidelines range. We agree, and thus remand to the trial court for resentencing.

The *Davis-Frye* rule, adopted from *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955), and *Frye v United States,* 54 App DC 46, 47; 293 F 1013 (1923), allows the admission of expert testimony regarding novel scientific evidence only if that evidence has gained general acceptance among scientific experts in the field. The party offering the evidence carries the burden of demonstrating its acceptance in the scientific community. *People v Young,* 418 Mich 1, 21, n 7; 340 NW2d 805 (1983); *People v Gistover,* 189 Mich App 44, 46; 472 NW2d 27 (1991). The trial court's findings of fact regarding this issue will not be disturbed on appeal unless they are clearly erroneous. MCR 2.613(C); *Gistover,* p 46. A finding will be determined to be clearly erroneous if, after a review of the entire record, the appellate court is left with a

definite and firm conviction that a mistake has been made. *Id.*

Before reviewing the laboratory procedures, an understanding of the structure of the DNA molecule is necessary. The molecule is a double helix, shaped like a twisted ladder. Phosphate and deoxyribose sugar form the rails of the ladder. Four chemical bases—Adenine (A), Cytosine (C), Guanine (G), and Thymine (T)—lie next to each other on the sugar links along the sides of the ladder. Each A always bonds with a T on the other side of the ladder, and each C always bonds with a G on the other side of the ladder, so that the possible base pairs on the ladder are A-T, T-A, C-G, and G-C. The base pairs are connected by a hydrogen bond, such that the bonds form the rungs of the ladder. There are approximately three billion base pairs in one DNA molecule. Although no two human beings have the same sequence of base pairs (except for identical twins), we share many sequences that create common characteristics such as arms, legs, fingers, and toes. The sequences of variation from person to person are known as polymorphisms. They contain different alleles, which are alternate forms of a gene capable of occupying a single location on a chromosome. Polymorphisms are the key to DNA identification because they create the individual characteristics of everyone and are detectable in laboratory testing.

As described in the lower court proceedings, testing for DNA identification involves several procedures. Cellmark Diagnostics is the company that did the laboratory testing in this case. The preliminary procedure is extracting a DNA molecule from a cell. This can be accomplished by a protein enzyme, proteinase, and a soap breaking the cell membrane. Organic solvents are used to separate the DNA from protein, carbohydrates, and lipids.

DNA identification begins when the DNA is cut into pieces creating restriction fragment length polymorphisms (RFLP). In this phase, restriction enzymes from bacteria digest the DNA into fragments that the enzymes recognize. The goal of the forensic application of DNA identification is to isolate the few sequences of base pairs that are not identical in all humans.

The next step in the process is electrophoresis, which separates the different sizes of DNA.[1] The DNA is placed in a gel called agarose. The gel contains lanes. A DNA sample from the victim, the suspect, and from the crime scene evidence is loaded into separate lanes. Because DNA has a negative electrical charge, a positive current is run through the gel. The smaller, lighter fragments migrate toward the positive electrode faster than the bigger, heavier fragments. The DNA is then filtered to another medium where the fragments can be better seen. The DNA is stained with ethidium bromide so that it can be illuminated by ultraviolet light.

After separating the DNA by size, the two strands of the double-helix DNA are denatured. A solution of alkali separates the DNA, like opening a zipper or splitting the rungs of the ladder. The single strands of DNA are then transferred onto a nylon membrane. The process of transferring the DNA from the gel to the nylon membrane is known as "Southern blotting," named for the person who originated the technique, E.M. Southern. In fact, the first six steps in the process, from the cutting of the DNA by the enzyme to the making of the autoradiogram (discussed below), are sometimes referred to as Southern blotting.

---

[1] Electrophoretic typing of dried bloodstains has gained general scientific acceptance for reliability and is admissible in criminal trials where adequate safeguards have been implemented. *Gistover*, pp 53-54.

The next step is hybridization. Radioactively labeled DNA probes mark the RFLP for identification. The probes seek and attach, or hybridize, to the DNA on the nylon membrane. The residual probes that do not find complimentary DNA are then washed off the nylon filter. The filter is then placed underneath an x-ray film and developed into an autoradiogram. Dark bands appear on the autoradiogram where the probes hybridized to DNA. A single probe produces two bands on the autoradiogram. Cellmark uses four single locus probes at the same time, thus producing eight bands. Single locus means the probe attaches to DNA from one pair of chromosomes.

The results of the autoradiogram are then interpreted by examining the bands to determine if they match. This process, as well as the statistical analysis, was explained in *People v Axell,* 235 Cal App 3d 836, 847; 1 Cal Rptr 2d 411 (1991):

> Essentially the bands on the autorad from the victim's, suspect's, and crime scene evidence samples are "eyeballed" to see if they match within a certain measurement. If a match is declared, the likelihood that a match is unique must be determined. A match is said to occur if the sizes and number of the detected DNA fragments in various lanes are indistinguishable within a permissible degree of error. To calculate the permissible degree of error, Cellmark uses "resolution limits" as a unit of measurement to ascertain the "bin" or frequency at which an allele occurs in the population data base.
>
>       * * *
>
> To make a statistical evaluation of the data obtained from a DNA typing, it is necessary to know how frequently in the population a band of a certain size will be found, a question answered according to the principles of population genetics. Each probe recognizes a pair of bands—one from

each parent. The probability of the combination of two particular bands recognized by one of the probes is calculated by multiplying the product of the frequencies of the two bands by two. The probability of the band patterns from all four loci is determined by multiplying the products from all four loci. This is known as the "product" or multiplication rule.

The validity of this procedure presupposes that each fact observed, and entering into the calculation, is random and independent of the others, or adjustments are made for deviations from conditions known as "Hardy-Weinberg equilibrium" and "linkage equilibrium." The Hardy-Weinberg principle is an algebraic equation that describes the genetic equilibrium within a population, assuming random mating. A homozygote is an individual who has inherited the same allele (or same length allele) from both parents. If the incidence of homozygosity far exceeds the expected frequency of that condition, then the data base population is not in Hardy-Weinberg equilibrium. [Citations omitted.]

For a further, more detailed explanation of the DNA identification process and statistical analysis, see *People v Castro,* 144 Misc 2d 956, 964-970; 545 NYS2d 985 (1989).

At the pretrial hearing in this case, the preliminary examination testimony of Doctor David Houseman was incorporated into the record. Dr. Houseman is a professor of molecular biology at the Massachusetts Institute of Technology. He reviewed Cellmark's procedures at their laboratory. He testified that Southern blotting was applied worldwide in the diagnosis of genetic conditions such as cystic fibrosis, muscular dystrophy, and Huntington's disease. He stated that the test was generally accepted in the scientific community as reliable.

The prosecution first presented at the hearing

Doctor Bonnie Blomberg, an associate professor of molecular biology and immunology at the University of Miami School of Medicine. For the past ten years she has utilized the Southern blotting technique in researching ailments such as Graves' disease. She visited Cellmark's laboratory and is familiar with their procedures. The only difference between her research and Cellmark's testing was the use of different probes. She testified that Cellmark's technique was generally accepted in the scientific community as reliable.

The prosecution next called Doctor Michael Imperiale as an expert witness. Dr. Imperiale is an assistant professor of microbiology and immunology at the University of Michigan. He uses the Southern blotting technique in studying cancer-causing viruses. After reviewing Cellmark's protocols and visiting their laboratory, Dr. Imperiale stated that Cellmark's procedures conformed to his laboratory's standards regarding Southern blotting.

The next expert presented by the prosecution was Doctor George Herrin, Jr. His entire hearing testimony is not included in the lower court record provided to this Court. Nevertheless, Dr. Herrin, the DNA unit supervisor at the Georgia Forensic Laboratory and former staff scientist at Cellmark, testified at trial that the RFLP test was generally accepted in the scientific community.

The final expert called by the prosecution to testify at the hearing was Doctor David Ginsburg, who is employed at the University of Michigan medical school as a molecular biologist focusing on the genetics of bleeding disorders. He routinely uses the Southern blotting technique in the laboratory. Dr. Ginsburg also observed Cellmark's method of operations and reviewed their protocols. He concluded that the Southern blotting technique

performed by Cellmark was generally accepted within the scientific community as accurate and reliable.

Defense counsel then called an expert witness, Doctor Robert Bever. Dr. Bever is an associate director at Genetic Design, Incorporated, a paternity testing laboratory. He is familiar with and has performed the Southern blotting technique. He also stated that the DNA identification as performed by Cellmark is generally accepted within the scientific community as reliable.

All the expert witnesses testified that DNA identification is generally accepted in the scientific community. These witnesses were unquestionably disinterested and impartial experts in this particular field. *People v Young (After Remand)*, 425 Mich 470, 479-480; 391 NW2d 270 (1986). Further, the Congressional Office of Technology Assessment has found that DNA identification testing is valid and reliable in forensics when properly performed and analyzed by skilled personnel. *Axell*, pp 858-859. Indeed, all other jurisdictions that have addressed the admissibility of the results of DNA identification testing, under either a *Davis-Frye* standard or a reliability test under rules of evidence, have concluded that DNA identification testing is reliable. *Axell*, p 856; *Castro*, p 973 (although the procedure is reliable, the evidence was inadmissible because the testing laboratory failed to use generally accepted scientific techniques); *United States v Jakobetz*, 955 F2d 786 (CA 2, 1992); *Prater v State*, 307 Ark 180; 820 SW2d 429, 436 (1991); *Commonwealth v Curnin*, 409 Mass 218; 565 NE2d 440 (1991); *People v Lipscomb*, 215 Ill App 3d 413; 574 NE2d 1345, 1357 (1991); *Hopkins v State*, 579 NE2d 1297, 1302 (Ind, 1991); *State v Brown*, 470 NW2d 30, 32-33 (Iowa, 1991); *Smith v Deppish*, 248 Kan 217, 238; 807 P2d 144

(1991); *State v Davis,* 814 SW2d 593 (Mo, 1991); *State v Wimberly,* 467 NW2d 499, 505-506 (SD, 1991); *Caldwell v State,* 260 Ga 278, 285-287; 393 SE2d 436 (1990); *State v Pennington,* 327 NC 89, 101; 393 SE2d 847 (1990); *Kelly v State,* 792 SW2d 579, 585 (Tex App, 1990); *Glover v State,* 787 SW2d 544, 548 (Tex App, 1990); *State v Ford,* 301 SC 485, 490; 392 SE2d 781 (1990); *State v Schwartz,* 447 NW2d 422 (Minn, 1989) (DNA test results are admissible if performed with appropriate laboratory standards, but the results were found inadmissible there because the laboratory did not comport with quality guidelines); *State v Woodall,* 182 W Va 15; 385 SE2d 253 (1989) (testing procedures are reliable, but the results were inadmissible because they were inconclusive); *Andrews v State,* 533 So 2d 841 (Fla App, 1988); *Cobey v State,* 80 Md App 31; 559 A2d 391 (1989).

Defendant in this case acknowledges that gel electrophoresis is a generally accepted scientific method, but protests that the forensic application of the method is invalid. He raises the problem of crime-scene contamination. He also mentions the scarcity of DNA samples from the crime scene that limits the availability of repeated testing.

We do not require scientific tests to be infallible, but only that reasonable certainty follow from them. *People v Barbara,* 400 Mich 352, 365; 255 NW2d 171 (1977). Dr. Imperiale testified that if contamination were to occur, the testing would yield no result because of the total degradation of the DNA molecule. Alternatively, contamination would result in extra bands appearing on the autoradiogram. Compare *Young (After Remand),* p 500 (the effects of contamination on electrophoresis was not clear.) Unlike *Castro,* there was no indication of extra bands in this case. Dr. Blom-

berg stated that Cellmark's probes do not bind to either viral or bacterial DNA. Moreover, the DNA identification testing cannot result in a "false positive," i.e., a false match of the suspect's DNA and the sample from the crime scene. If the laboratory fails to take the proper steps in the procedure, no readable result is visible on the autoradiogram.

We conclude that the trial court did not clearly err in finding that the prosecution established that DNA identification testing is generally accepted in the scientific community as reliable. Given the overall acceptance of the technique in other jurisdictions, we hold that trial courts may take judicial notice of the reliability of DNA identification testing. *Woodall; Jakobetz.* Nevertheless, before a trial court admits the test results into evidence, the prosecutor must establish in each particular case that the generally accepted laboratory procedures were followed. See *Barbara,* p 415; *People v Lucas,* 188 Mich App 554, 580; 470 NW2d 460 (1991); Cf. *Jakobetz.* We are satisfied that Cellmark followed the generally accepted procedures in this case.[2]

Defendant argues that the statistical analysis of the DNA identification testing is inadmissible at trial. He questions the notion of the Hardy-Weinberg equilibrium, contending that populations fail to randomly mate because identifiable subpopulations tend to mate within their own ethnic community because of economic forces and lack of

---

[2] In *Schwartz,* pp 426-428, the Minnesota Supreme Court held that the DNA identification test results were inadmissible because the laboratory, Cellmark, did not comply with the quality control standards published by the FBI's Technical Working Group on DNA Analysis Methods and the California Association of Crime Laboratory Directors. In this case, however, Dr. Herrin testified that while these guidelines provided good suggestions, they do not have any relevance to the reliability of the testing.

social mobility.[3] Defendant claims that the danger with DNA identification evidence is that "trial by mathematics" will evolve. At trial, Dr. Herrin testified that the statistical possibility of matching the seven bands on the crime scene autoradiogram was one in four hundred million.

Defendant's contentions are inconsistent with the testimony presented in the lower court. Dr. Ginsburg testified that he was familiar with the gene and allele frequency computations of Cellmark and thought they were valid. He stated that their calculations tended to be conservative. The markers Cellmark uses are highly polymorphic, meaning that the results of the testing include numerous possibilities of alleles. Consequently, the possibility of an independent match of bands can be calculated to a high degree of probability. Defendant's expert witness, Dr. Bever, did not question the validity of Cellmark's computations, but only stated that he would be more confident of the results if Cellmark used a larger database. Notwithstanding this concern, one expert testified that a statistical analysis can be recomputed using the latest available database without repeating the Southern blotting procedures.

The defendant fails to persuade us that the admission of DNA identification evidence will lead to an improper trial by mathematics. In *People v Collins,* 68 Cal 2d 319; 438 P2d 33 (1968), the Supreme Court of California held that the trial court erred in admitting without an adequate evidentiary foundation and proof of statistical independence evidence regarding the mathematical probability of persons with the defendant's characteristics having committed the robbery. Unlike

[3] See Hoeffel, *The dark side of DNA profiling: Unreliable scientific evidence meets the criminal defendant,* 42 Stan L R 465, 490 (January, 1990).

*Collins,* the lower court record in this case contains an adequate foundation and proof of independence of the statistical analysis. The results of DNA identification testing would be a matter of speculation without the statistical analysis, and it does not remove the issue of identity from the jury, which is free to disregard or discredit the evidence. *Brown,* p 33. Like the statistical evidence concerning serological testing, the statistical evidence is relevant in this case, and any question concerning the size of the database or the Hardy-Weinberg equilibrium goes to the weight of the evidence and is properly left to the jury. *People v Proveaux,* 157 Mich App 357, 365-366; 403 NW2d 135 (1987).

Some courts of other jurisdictions have ruled that DNA identification evidence is admissible at trial, but have then refused to allow into evidence the statistical analysis of the testing because the databases were shown to have not been in Hardy-Weinberg equilibrium. *Curnin,* pp 225-227; *Caldwell,* pp 289-290; *State v Pennell,* 584 A2d 513, 517-520 (Del Super, 1989). However, other courts have recognized that conservative or reduced calculations such as those used by Cellmark may correct any Hardy-Weinberg deviation problems. *Axell,* p 868; *Caldwell,* p 289; *Castro,* p 969. The statistical analysis of DNA testing is inadmissible in some jurisdictions because of its prejudicial effect. *Schwartz,* pp 428-429; *Pennell,* pp 519-520. On the other hand, some courts have held that such evidence is a matter of weight for the jury. *Axell,* p 868; *Hopkins,* p 1303; *United States v Yee,* 134 FRD 161 (ND Ohio, 1991). In this case, Dr. Blomberg stated at the pretrial hearing that Cellmark properly calculated the allele frequency. She testified that the standard deviation from repeatedly running the sample molecules through one gel was so small that it was inconsequential. More-

over, Dr. Ginsburg further stated that statistical analysis, based on a database of between 125 and 250 subjects, was valid. Thus, we find that the trial court did not abuse its discretion by admitting the statistical analysis into evidence. *Jakobetz; Axell.*

Turning to the issue concerning the defendant's sentences, we agree with the defendant that the trial court failed to articulate sufficient reasons for departing from the sentencing guidelines range. Under the principle of proportionality, we review the defendant's sentences to determine whether they are proportionate to the seriousness of the circumstances surrounding the offense and the offender. *People v Milbourn,* 435 Mich 630, 636; 461 NW2d 1 (1990); *People v Witcher,* 192 Mich App 307, 308; 480 NW2d 636 (1991). The sentencing court is required to state on the record the criteria considered and the facts supporting the sentence imposed in order to aid the appellate review of sentences imposed. *People v Fleming,* 428 Mich 408, 428; 410 NW2d 266 (1987); *People v Poppa,* 193 Mich App 184, 189-190; 483 NW2d 667 (1992). Where the sentence imposed is within the recommended guidelines range, reference to the guidelines alone constitutes sufficient explanation. *People v Broden,* 428 Mich 343, 354; 408 NW2d 789 (1987); *People v Dukes,* 189 Mich App 262, 266; 471 NW2d 651 (1991). However, where the sentence imposed exceeds the recommended minimum range, the trial court must articulate both on the record at sentencing and on the sentencing information report its reasons for departing from the guidelines. *Fleming; People v Johnson,* 187 Mich App 621, 630; 468 NW2d 307 (1991).

In this case, the sentencing guidelines recommended a minimum range of six to fifteen years for the kidnapping conviction, and the trial court sentenced the defendant to life imprisonment for

that conviction. The minimum range for the first-degree criminal sexual conduct convictions was eight to twenty years, and the minimum range for the armed robbery conviction was five to fifteen years. The court sentenced the defendant for each of these remaining three counts to 70 to 150 years' imprisonment. The trial court stated at sentencing that the defendant repudiated all moral authority, was a danger to the community, and that he denied a civilized society to the victim and her family. The court failed to state on the sentencing information report its reasons for departing from the guidelines. Because the defendant's sentences were more than three times as long as the recommended minimum term of years and because the court failed to state specifically its reasons for departing from the guidelines, we vacate the defendant's sentences and remand for resentencing. Applying the factors listed by this Court in *People v Fisher (After Second Remand)*, 190 Mich App 598, 608; 476 NW2d 762 (1991), lv gtd 439 Mich 995 (1992), we deny the defendant's request that he should be resentenced before a different judge.

Convictions affirmed, sentences vacated, and case remanded for resentencing in accordance with the principle of proportionality.

MARILYN KELLY, J., concurred.

GRIFFIN, J. *(concurring in part and dissenting in part)*. I concur in that portion of the majority's opinion recognizing the scientific acceptability of DNA identification testing. Further, I join my colleagues in affirming the admissibility of the DNA identification testing in this case and in affirming defendant's convictions. I dissent, however, with regard to the remand for resentencing.

The majority has acted beyond its authority in

vacating defendant's sentences and remanding the case for resentencing. No court has the authority to vacate a valid sentence. A remand for resentencing may be ordered only with regard to those sentences that are invalid. *In re Dana Jenkins,* 438 Mich 364, 369, n 3; 475 NW2d 279 (1991), *People v Whalen,* 412 Mich 166, 169-170; 312 NW2d 638 (1981), and *People v James Williams,* 437 Mich 1045; 471 NW2d 561 (1991) (Boyle, J., dissenting).

The majority opinion contains no finding that the sentences at issue are invalid. Rather, the majority vacates the sentences and orders resentencing "[b]ecause the defendant's sentences were more than three times as long as the recommended minimum term of years and because the court failed to state specifically its reasons for departing from the guidelines." *Ante,* p 281.

First, I respectfully disagree with the majority's conclusion that the sentencing judge did not adequately articulate his reasons for departing from the sentencing guidelines. In sentencing defendant, the Honorable Fred M. Mester acknowledged that the sentences imposed exceeded the guidelines. However, Judge Mester stated that he was departing from the guidelines because of defendant's extremely violent propensities, the serious danger defendant posed to the community, the heinous nature of the multiple crimes committed, and the extreme suffering inflicted upon the victim. Such reasons are sufficient to justify a departure from the guidelines and for the imposition of the maximum penalty allowed by law. See *People v Milbourn,* 435 Mich 630; 461 NW2d 1 (1990), and *People v Redman,* 188 Mich App 516; 470 NW2d 676 (1991). I find the articulation more than adequate.

I further note that the relief ordered by my

colleagues is inappropriate. The appropriate remedy for failure to articulate is not a full resentencing. A remand solely for articulation of reasons is all that is required. See *People v Triplett,* 432 Mich 568; 442 NW2d 622 (1989).

The second reason my colleagues give for vacating the sentences is that the sentencing guidelines have been exceeded. However, departure from the guidelines is not itself a reason to vacate a valid sentence. Recently, in *People v Redman, supra,* we affirmed sixty- to ninety-year sentences, sentences out of the guidelines range, for first-degree criminal sexual conduct and kidnapping convictions, holding that the sentences recommended by the guidelines were disproportionate to the heinous nature of the offense. Similarly, I find the sentences recommended by the guidelines in the present case disproportionate to both the seriousness of the offense and the background of the offender.

As noted by the sentencing judge, defendant is an exceptionally dangerous individual who has no respect for authority and no sense of morality. At sentencing, defendant remained defiant and unrepentant, turning his back to the judge while his sentences were pronounced. At the conclusion of the hearing, defendant made the following rebellious vow:

*The defendant:* I'll be back.

Approximately a month before the present criminal episode, defendant committed substantially similar acts of first-degree criminal sexual conduct, kidnapping, and armed robbery in Macomb County. According to the presentence report, these prior offenses "involve[d] several identical elements to our instant case." Specifically, defendant, while armed with a knife, abducted a woman,

forced her to perform sexual acts, and then robbed her.

The facts in the present case are equally as horrendous and have been aptly described by the prosecutor as follows:

> This case presented a situation embodying a woman's worst fear: abduction and brutal rape by an armed stranger—the fear of violent death and the violation of one's most intimate and private being. A knife was held to the victim's throat. She was forced to endure the pain and humiliation of forced sexual penetration—both oral and vaginal. The horror she was forced to endure will last as long as she lives.

Additionally, I note that the abduction occurred in a K mart parking lot shortly before the victim was to pick up her husband at the airport. During the kidnapping, defendant used his knife to cut the victim's face and both of her hands. Defendant repeatedly held the knife at the victim's throat and before the rape threatened to slash her between the legs. The victim was thoroughly terrorized and convinced that she was going to die.

Defendant was convicted of three high-severity felonies: first-degree criminal sexual conduct, armed robbery, and kidnapping. Each offense is separately punishable by a sentence of up to life in prison. After thoroughly reviewing the record, I find defendant's sentence of life imprisonment for his kidnapping conviction and sentences of 70 to 150 years for his convictions of first-degree criminal sexual conduct and armed robbery proportionate to the seriousness of the circumstances surrounding the offenses and the offender. Accordingly, I would affirm.[1]

---

[1] Defendant's brief contains a reference to an alleged violation of

Finally, I acknowledge that the sentence information report does not contain the attachment (SIR 88-2) on which the sentencing judge is directed to state the reasons for departing from the guidelines. However, this is a ministerial task for which a full resentencing is not required. See, generally, *Triplett, supra,* and *People v Bunn,* 166 Mich App 584; 421 NW2d 247 (1988). In this case, the record made at sentencing is more than sufficient to permit appellate review. I would therefore affirm defendant's convictions and sentences but remand for the completion of the SIR guideline departure form.

the doctrine of *People v Moore,* 432 Mich 311; 439 NW2d 684 (1989). However, because this issue is not identified in defendant's statement of issues, it is unpreserved. *People v Yarbrough,* 183 Mich App 163, 165; 454 NW2d 419 (1990); also see *Mitcham v Detroit,* 355 Mich 182, 203; 94 NW2d 388 (1959). If the Supreme Court chooses to consider the issue, I urge the Court to revisit *People v Moore* and overrule it on the ground that it was wrongly decided.