*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LAMONT TORBERT,

        Defendant-Appellant.

UNPUBLISHED
May 11, 2023

No. 362908
Ingham Circuit Court
LC No. 20-000938-FC

Before: BOONSTRA, P.J., and GADOLA and YATES, JJ.

PER CURIAM.

Defendant faces charges based upon an alleged sexual assault perpetrated by several men in 2001. Authorities collected deoxyribonucleic acid (DNA) in 2001, but no DNA contributor was identified until 2018, when defendant's DNA was entered into the DNA index system and matched the DNA collected in 2001. At some point between 2018 and 2020, part of the file associated with the DNA sample went missing. In this interlocutory appeal on leave granted,[1] defendant contests the trial court's denial of his motion to exclude the DNA evidence, arguing that without the missing portion of the file, the reliability of the DNA analysis cannot be established. We reject defendant's argument and affirm the trial court's denial of defendant's motion to exclude the DNA evidence.

## I. FACTUAL BACKGROUND

On November 29, 2001, when the victim was a student at Michigan State University, she went with some friends to a social gathering at an apartment building. While at the apartment, the victim had several drinks and felt ill, so she went to lie down in the bed of her male friend and she fell asleep. When she woke up, she was naked from the waist down and a man was on top of her engaging in vaginal intercourse. She said "stop," "no," and "get off," and tried to push him away. Another unidentified man who was naked from the waist down was standing in the bedroom. The victim passed out after somebody put a pillow over her head. When she woke up, she was on her

---

[1] *People v Torbert*, unpublished order of the Court of Appeals, entered January 3, 2023 (Docket No. 362908).

stomach and an unidentified man was behind her having vaginal intercourse with her. The victim saw another unidentified man, naked from the waist down, standing near the bed. Eventually, one of the victim's friends came into the bedroom, pulled the victim off the bed, and took her from the apartment.

The victim went to the hospital and underwent a sexual assault nurse examination, which resulted in the collection of swabs of the victim's genital area and clothing. The Michigan State University Police Department (MSUPD) collected the swabs and submitted them to the Michigan State Police (MSP) laboratory for DNA analysis. An initial chemical and microscopic examination of the swabs revealed the presence of seminal fluid and sperm cells on the victim's underwear and on her vagina, rectum, and perianal area. The MSP laboratory extracted DNA from the swabs in April 2002. Because the contributors of the DNA were unknown, the MSP laboratory entered the DNA profile into the Combined DNA Index System (CODIS).

In 2018, CODIS alerted to a match that indicated that the DNA profile extracted from the victim's perianal area matched defendant's DNA profile.[2] To confirm the CODIS results, MSUPD executed a search warrant on defendant. The MSP laboratory typically uses a defendant's known DNA sample and compares it with the original DNA profile. After receiving defendant's known sample, the MSP laboratory realized that the paper records concerning the original DNA analysis of the victim's swabs—the case jacket—were missing.[3] Despite the missing case jacket, the MSP laboratory was able to analyze the original DNA extracts in January 2020. The tubes that contained the extracts still had the original labels with the MSP laboratory number, record number, and item identifier. A 2002 report on these DNA tubes identified what DNA extract material corresponded with which evidence number. The 2002 laboratory report referred to samples 5112.01A-M (DNA vaginal swabs-male fraction), 511201C-M (rectal swabs-male fraction), 5112.01D-M (perianal swabs-male fraction), and 5112.01E-M (panty-male fraction), and stated that the samples "reveal the presence of multiple male donors." After reanalysis of the DNA extracts, the MSP laboratory confirmed in a 2020 report that defendant's known DNA sample matched the DNA extracted from the swabs of the victim's vaginal, rectal, and perianal areas and from her underwear. Defendant was charged with one count of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(d), and, "in the alternative," with one count of third-degree criminal sexual conduct (CSC-III), MCL 750.520d.

Defendant filed a motion to exclude the DNA test results under MRE 702 and *Daubert*[4] on the ground that the missing case jacket rendered it impossible to assess the reliability of the DNA extraction process in 2002 and, in turn, the reliability of the results obtained in the 2020 reanalysis of the DNA extracts. He further argued that the loss of the case jacket created confusion as to the contents of the tubes that contained the DNA extracts when the DNA reanalysis took place in 2020.

---

[2] Defendant's DNA appears to have been obtained through an unrelated interaction with the police.

[3] In April 2018, an MSP forensic scientist had retrieved the case jacket after the CODIS alert, made a photocopy of the necessary report, and refiled the case jacket. In July 2019, the forensic scientist tried to pull the case jacket to prepare for a meeting about this case and discovered that the case jacket was missing. In addition, the original swabs apparently had been destroyed by MSUPD.

[4] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

Also, defendant contended that there were issues with the chain of custody and called into question the ethics of the analyst who performed the reanalysis in 2020. Finally, he asserted that his due-process rights would be violated if the data on which the MSP laboratory relied was not available to him for review and address on cross-examination.

The prosecution responded that it would not present the 2002 DNA analysis as substantive evidence at trial. It asserted that defendant had received all of the reports and underlying data used in the 2020 reanalysis of the DNA extracts, which formed the evidence the prosecution planned to introduce at trial. The prosecution also asserted that the MSP laboratory reanalyzed the original DNA extracts by applying reliable principles and methods and compared the reanalyzed results to defendant's known DNA. Finally, the prosecution insisted that any issues regarding the chain of custody of the DNA extracts and the credibility of the forensic scientist would bear upon the weight of the evidence, not its admissibility.

The trial court granted defendant's request for an evidentiary hearing as to the reliability of the 2002 extraction process, but stated that "other matters such as chain of custody and personnel matters . . . go to the weight of the DNA evidence and the ultimate opinion of the analyst." During the evidentiary hearing, the prosecution's expert, Jeffrey Nye,[5] the director of the Forensic Science Division of the MSP, gave a detailed description of the DNA extraction process used to obtain, or "extract," DNA. He testified that the extraction process remained largely unchanged since 2001. According to Nye, that process separated the epithelial cells, which are readily breakable cells such as skin cells and cells from inside the mouth or the vaginal tract, from the more rigid sperm cells. The epithelial cells are known as the "female fraction" and are placed into a tube. The sperm cells are called the "male fraction" and are placed into a separate tube.

After the DNA is extracted, the next step is quantification—that is, a determination of how much DNA exists. There is a target range for DNA analysis because of limitations on how much DNA extract the instrumentation and system can accept. If the amount of DNA extracted is outside the target range, a separate tube is used to dilute the DNA, and the diluted extract is then analyzed. According to Nye, the concentrated extract and the diluted extract are essentially the same extracts with different concentrations of DNA. The extraction tubes are labeled with a laboratory number, a record number, and an item identifier unique to the specific case by the person who performs the DNA analysis. Nye testified that DNA does not change over time and DNA will not degrade if it is properly stored. If DNA does degrade, the degradation does not change the result. Rather, the degradation prevents a result from being obtained. The DNA extracts in this case were preserved by dehydrating the DNA in the labeled tubes.

Nye did not believe that the missing case jacket from the 2002 analysis had any impact on the integrity of the original analysis. He observed that the original extracts were labeled and were identifiable to the case. Nye did acknowledge that the laboratory report from the 2020 reanalysis indicated that there was a clear tube and a pink tube for each item tested and that it was unclear from the records whether the pink tube contained the concentrated DNA extract and the clear tube

---

[5] Nye was the forensic scientist who performed the original DNA analysis of the evidence in this case, but he acknowledged that he did not have an independent recollection of this particular case.

contained the diluted DNA extract, or vice versa.[6]  Nye explained that a substantial difference in concentration of DNA in each tube would indicate whether the tube contained the concentrated DNA extract or the diluted DNA extract.  Nye testified that, nevertheless, the tubes for each item would contain the same DNA.  Nye noted that if standard operating procedures were not followed in extracting and testing the DNA, "the important part is that it's not that you're getting the wrong result.  It would just keep you from getting a result."

Defendant's expert, Janine Arvizu, a chemist and laboratory auditor, testified as an expert in internal auditing and quality assurance for laboratories.  She opined that any conclusions drawn from the DNA evidence in this case were based on "secondary records."  Her classification of the records as being "secondary" arose from the loss of the case jacket from the 2002 DNA analysis and the use of DNA extracts, rather than the original swabs.  Arvizu was concerned about the loss of the case jacket because an "unambiguous record trail identifying the identity, unique identity, and the origin of each and every tested item" was necessary.  She cited the possibility of human error in transcribing records as one of her primary concerns.  Arvizu criticized the MSP laboratory because it was not apparent which tubes contained the diluted extract and which tubes contained the concentrated extract.  She conceded, however, that the tubes containing the DNA extracts were labeled with what appeared to be unique identifying numbers.  She also admitted that the tubes for each sample contained the same DNA; the only difference was in the concentration of the DNA. Arvizu opined that, in this case, the MSP laboratory did not meet international standards regarding laboratory recordkeeping and its failure to maintain records undermined the reliability of the DNA analysis.

The trial court issued a written opinion and order denying defendant's request to exclude the results of the DNA analysis.  The trial court concluded that the original DNA extraction process was reliable and that there was no basis to exclude the evidence.  The trial court reasoned that the fact that analysis yielded a result constituted evidence that the extraction process was performed properly and the extracts were properly stored.  The trial court noted that Arvizu's criticisms that the laboratory could not unambiguously identify the origin of the tested items was merely a chain-of-custody issue that did not call into question the reliability of the extraction, and therefore that concern bore upon the weight of the evidence, not its admissibility.  The trial court determined that there was sufficient evidence to establish that the DNA extracts were what they were purported to be because the extract tubes were labeled.  Thus, the trial court concluded that the DNA reanalysis performed in 2020 was based upon a sufficiently reliable extraction process in 2002.  This appeal followed.

---

[6] During the 2020 reanalysis, the analyst added a "P" for pink tube or a "C" for clear tube to the end of the item number for each sample.  The item description for each sample was obtained from the 2002 lab report.  The pink and the clear tubes for the male fractions for samples 5112.01A, 5112.01C, 5112.01D, and 5112.01E were reanalyzed.

## II. LEGAL ANALYSIS

On appeal, defendant contends that the trial court abused its discretion when it determined that the results of the 2020 DNA reanalysis were admissible at trial. Defendant argues that because the laboratory failed to comply with the guidelines for record keeping, and therefore lost the case jacket and no longer had the original DNA swabs, the reliability of the 2002 extraction process is suspect. Thus, defendant concludes that the reliability of the 2020 reanalysis cannot be established because that reanalysis was based upon the 2002 DNA extracts. Defendant insists that, despite the fact that the tubes containing the extracts were labeled, there is no way to be certain that the labels are correct, and therefore no way to be certain what the tubes contain. Defendant also argues that the only way to establish the admissibility of DNA test results is to furnish proof that the laboratory followed generally accepted standards, which requires production of the case jacket. Beyond that, defendant contends that his due-process rights will be violated if the data on which the laboratory relied in performing the DNA analysis is not available for him to review. Finally, defendant argues that the trial court impermissibly narrowed the scope of the evidentiary hearing. We conclude that defendant's arguments lack merit.

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id*. at 217. We review the trial court's factual findings underlying the decision to admit or exclude evidence for clear error. *People v Murphy (On Remand)*, 282 Mich App 571, 584; 766 NW2d 303 (2009). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v Brooks*, 304 Mich App 318, 319-320; 848 NW2d 161 (2014) (quotation marks and citation omitted). Whether a defendant's right to due process was violated is a constitutional question that we must review de novo. *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015).

"[T]he admission of real evidence does not require a perfect chain of custody." *People v White*, 208 Mich App 126, 130; 527 NW2d 34 (1994). A "deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility once the proffered evidence is shown to a reasonable degree of certainty to be what its proponent claims." *Id*. at 130-131. "[T]he admission of relatively indistinguishable evidence requires a chain of custody only sufficiently complete to 'render it reasonably probable that the original item has neither been exchanged with another nor been contaminated or tampered with.' " *Id*. at 131. The threshold question is "whether an adequate foundation for admission of the evidence has been laid under all the facts and circumstances of each individual case." *Id*. at 133. "Once a proper foundation has been established, any deficiencies in the chain of custody go to the weight afforded to the evidence, rather than its admissibility." *Id*. In rejecting an argument that DNA evidence must be excluded because the DNA evidence lacked a proper foundation as a result of a missing link in the chain of custody, we noted that the defendant had not alleged that the technician had "actually lost, misidentified, or tampered with" the blood sample, but "only that it is possible that she did so[.]" *People v Herndon*, 246 Mich App 371, 405; 633 NW2d 376 (2001).

-5-

Here, defendant concedes that he is not challenging the science that supports DNA analysis. Rather, defendant frames this as a challenge under MRE 702[7] to the reliability of the DNA analysis performed in this case. But defendant has not demonstrated any errors or irregularities in the DNA extraction performed in 2002 that could affect the reliability of the reanalysis in 2020. Defendant merely points to what is undisputed—the MSP laboratory lost the case jacket. Despite the loss of the case jacket, the methods employed in this case were still applied in a reliable manner. Nye's testimony establishes that: (1) seminal fluid was located on the original DNA swabs; (2) DNA was extracted from those swabs; (3) the extracted materials were separated into "female" and "male" fractions in separate tubes; (4) the tubes were labeled with unique identifying numbers that linked each tube to the original swabs; and (5) the extracted materials were properly preserved. Further, Nye's testimony established that, even though it was not known whether the pink tubes or the clear tubes contained the diluted extract, the DNA in both the pink and the clear tubes was the same.

Nye testified that the extraction process would only yield testable DNA if it was performed correctly. Nye's uncontroverted testimony established that if there were issues with the extraction process, the result would be that no DNA would be identified from the extraction. Nye testified unequivocally that it was not possible for a defective extraction process to yield an incorrect DNA result. Additionally, Nye testified that the failure to properly preserve DNA extracts would cause degradation of the sample, which would result in the failure to produce a result. Thus, the fact that a result was obtained constitutes evidence that the extraction process and the storage of the DNA extracts in this case were properly conducted. Accordingly, the trial court did not commit an abuse of its discretion in determining that the 2002 extraction process was sufficiently reliable.

The trial court ruled that the issues defendant raised—record-keeping deficiencies and the possibility of transcription errors—were more properly characterized as challenges to the chain of custody. Those issues pertain to whether the mixture in the tubes was what it was purported to be. Defendant contends that it was not definitively established that the tubes were properly labeled, so the contents of the tubes cannot be definitely determined. As a result of that uncertainty, defendant insists that we do not know whether the source of the DNA extract in a particular tube was a skin cell or a sperm cell. Despite defendant's attempt on appeal to frame this as an issue of admissibility under MRE 702, we agree with the trial court that the issues relate to the chain of custody of the DNA extracts, not to the reliability of the extraction process. Additionally, we agree with the trial court that the evidence presented demonstrated to a reasonable degree of certainty that the mixtures contained in the tubes were what the prosecution claimed. See *White*, 208 Mich App at 130-131.

---

[7] MRE 702 states:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The evidence established that the tubes containing the extracts were labeled with identifiers corresponding to the 2002 laboratory report. That laboratory report stated the origin of the extract contained in each tube—either a sperm cell or an epithelial cell—and where on the victim's body or clothing that cell was found. Defendant maintains that the prosecution's claim that the DNA derived from a sperm cell, rather than an epithelial cell, was unreliable because "it is not rationally derived from a sound foundation." But this is inconsistent with the evidence presented to the trial court. During the evidentiary hearing, Nye offered testimony about how epithelial cells and sperm cells are separated in the DNA extraction process. Nye testified that initial analysis of the evidence from the original swabs confirmed the presence of sperm cells and seminal fluid. Then the DNA extraction process separated the epithelial cells from the sperm cells, and the sperm cells were washed to remove residue left behind from epithelial cells. The sperm cells from each sample were put into a tube labeled as the "male fraction." The samples reanalyzed in 2020 in this case were identified as "male fractions" obtained from the victim's vaginal, rectal, and perianal areas, as well as from her underwear. Defendant's argument that it is not known with certainty what is in each tube relies upon a deficiency in the chain of custody. Additionally, while there was some uncertainty about which tubes contained the diluted DNA extract, that would have no impact on the results of the analysis.

Given these facts, it is reasonably probable that the extracts contained in the labeled tubes are what they are purported to be. See *White*, 208 Mich App at 131. Accordingly, any deficiencies in the chain of custody of the DNA extract goes to the weight afforded to that evidence, rather than its admissibility. See *id*. at 133. The trial court did not abuse its discretion when it admitted this evidence and left it to the trier of fact to determine how much weight it deserves. The trial court's decision to admit the DNA evidence was not outside the range of principled outcomes, so it is not an abuse of discretion. See *Unger*, 278 Mich App at 216-217.

Defendant also argues that the prosecution must establish that generally accepted standards were followed in handling defendant's DNA. He relies on this Court's opinion in *People v Adams*, 195 Mich App 267; 489 NW2d 192 (1992), modified on other grounds 441 Mich 916 (1993), to support this position. Defendant maintains that the only way to establish this fact is to produce the missing case jacket. *Adams* involved the admissibility of DNA analysis and this Court held that, in general, DNA identification is reliable. *Id*. at 277. This Court cautioned, however, that "before a trial court admits the test results into evidence, the prosecutor must establish in each particular case that the generally accepted laboratory procedures were followed." *Id*. This Court expressed satisfaction that generally accepted practices were followed there because the laboratory's failure to comply with certain quality control standards did "not have any relevance to the reliability of the testing[.]" *Id*. at 277 n 2. Here, any shortcomings by the MSP laboratory concerning the loss of the case jacket did not relate to the reliability of the testing. The standards that defendant claims were unmet involve the control, protection, and maintenance of records as well as the existence of an evidence log. No evidence suggests that the materials in this case were not what they purported to be, which is bolstered by the labels on the DNA extract tubes and the item descriptions for the relevant samples in the 2002 laboratory report. Additionally, no evidence exists that the extraction process was faulty. Therefore, any recordkeeping errors that occurred do not justify exclusion of the DNA reanalysis that occurred in 2020.

Defendant additionally argues that his rights to a fair trial and due process will be violated because some data on which the analysts relied is not available for review and cross-examination.

But defendant overlooks the fact that the DNA extracts were reanalyzed in 2020 and the data from that 2020 reanalysis is available to him. Defendant will not be prevented from pursuing his theory of the case or attacking the weight of the evidence based on the missing case jacket and the original swabs. Any deficiency in the chain of custody, like any uncertainty about what the DNA mixture contained, goes to the weight of the evidence. Consequently, any assertion that defendant will be denied a fair trial or that he cannot pursue a defense is meritless.

Finally, defendant argues that the trial court ignored other pertinent issues when it focused too narrowly on the issue of whether the DNA extraction process was reliable in 2002. At a hearing on defendant's motion on June 14, 2021, defendant asserted that the 2020 reanalysis of the extracts was dependent upon an accurate and reliable analysis of the DNA in 2002. The trial court granted defendant's request for an evidentiary hearing in response to that assertion and made clear that the evidentiary hearing would simply address "the reliability of the extracts produced in 2002." The evidentiary hearing started with a detailed discussion of the scope of the issue to be addressed, and defendant did not challenge the trial court's characterization of the scope of the issue. Defendant contends that the trial court should have more fully explored the admissibility of the DNA analysis under every part of MRE 702. But as we have explained, the trial court correctly decided that the issues defendant raised related to the chain of custody, rather than the admissibility of the evidence under MRE 702. Consequently, the record does not support defendant's suggestion that the trial court's focus at the evidentiary hearing was too narrow.

Affirmed.

/s/ Mark T. Boonstra
/s/ Michael F. Gadola
/s/ Christopher P. Yates